H. EARL CLACK CO., PLAINTIFF, *v.* PUBLIC SERVICE COMMISSION ET AL., DEFENDANTS.

(No. 7,146.)

(Submitted May 20, 1933. Decided June 19, 1933.)

[22 Pac. (2d) 1056.]

*Mr. H. H. Schwartz,* of the Bar of Casper, Wyoming, *Mr. Donald Campbell, Mr. John G. Brown* and *Mr. L. V. Ketter,* for Plaintiff, submitted a brief; *Messrs. Schwartz, Campbell* and *Brown* argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, and *Mr. Jeremiah J. Lynch,* First Assistant Attorney General, for Defendants, submitted a brief; *Mr. Lynch* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This is an original proceeding in which the plaintiff seeks an injunction prohibiting the Public Service Commission of Montana and the Attorney General of the state from enforcing the provisions of Chapter 184 of the Laws of 1933.

The title of the Act is: "An Act Relating to Price Charged for Any Standard Petroleum Product and Establishing a Differential Basal Rate Point Within the State of Montana, Providing for Procedure in the Determination of Price Under

This Act, Defining Standard Petroleum Product to be a 'Public Utility,' Defining What is Included Within the Term 'Standard Petroleum Product,' Construction to be Placed Upon This Act, Prescribing Duties of County Attorney, Providing Penalties for the Violation Thereof, and Repealing All Acts and Parts of Acts in Conflict Herewith."

Section 1 reads: "Any person, firm, company, association or corporation doing business within the state of Montana who shall charge or demand a higher price for any standard petroleum product from any person or customer within the state of Montana than is being charged by such person, firm, company, association or corporation for a like article of standard petroleum product to other persons or customers in the state of Montana or in any adjoining state shall be guilty of discrimination which is hereby declared to be a fraud, and any said person, firm, company, association or corporation, and their officers and agents participating guilty of a misdemeanor. When competent proof is offered, in the trial of any action under this Act, of a demand for or the receipt of a higher price for any standard petroleum product in this state by any person, firm, company, association or corporation than is charged for the same or a similar article of standard petroleum product of other persons or customers in the state of Montana or in any adjoining state at substantially the same time, the burden of proof will then be upon such person, firm, company, association or corporation, their officers or agents, on trial to prove that the difference in price was justified."

Section 2 reads: " 'Standard Petroleum Product' referred to in this Act is hereby defined to be a 'Public Utility' within the meaning of this Act."

Section 3 provides that the term " 'Standard Petroleum Product' * * * refers to and includes gasoline, fuel oil, distillates, greases and lubricating oils."

Subsection (a) of section 3 directs the Public Service Commission of Montana within thirty days after the approval of the Act to establish one or more differential basal rate points within the state "to be used as a basis for determining gasoline

and petroleum product rates'' within this state, and subsection (b) authorizes the commission to make reasonable rules and regulations regarding the distribution of gasoline and petroleum products within the state, and provides that ''within thirty (30) days' notice, a dissatisfied party or parties may appeal from the rulings of said commission to courts of competent jurisdiction for a review of the findings of said commission.''

Section 4 says the Act is ''intended to compel persons, firms, companies, associations or corporations doing business in the state of Montana dealing in standard petroleum products to treat all of their customers in the state of Montana on an equal with all of their customers in the state of Montana or adjoining states, and to promote the uniform application of the law of the state of Montana providing a license tax on all gasoline used by motor vehicles when traveling over the public highways, and this Act shall be liberally construed to accomplish that end.''

Section 5 provides that upon written complaint made by a citizen to the county attorney of any county in which a discriminatory act has been committed, that officer shall promptly investigate and either ''prosecute the action'' or give to the complainant a written statement of his reasons for not doing so; and section 6 provides that any person, firm, company, association or corporation, their officers or agents, violating any provisions of this Act, shall be guilty of a misdemeanor and shall be punished by a fine of not exceeding $500.

Section 7 provides that, in addition to the penalty provided in the criminal action, ''any customer of such person, firm, company, association and corporation or his assigns may bring a civil action in any county in which such offending corporation may be doing business, and recover therein not only actual damages for any violation of this Act, but also exemplary damages for such reasonable sum as the jury may deem proper punishment for the unlawful practice of discrimination as herein defined.''

It is alleged in the complaint, among other things, that the plaintiff corporation is engaged in the business of selling

standard petroleum products in Montana, North Dakota, Idaho and Washington, wherein it operates approximately forty retail and forty-five wholesale plants in which it employs a large number of persons and has over a million dollars invested; that the conditions existing in each of plaintiff's plants and stations in Montana and in adjoining states with respect to the original cost of its product, freight rates, transportation charges, hauling, handling, delivering, rent, property investment, insurance, taxes, wages, competition, credits and general operating expenses are not uniform; that its plants and stations in Montana and the adjoining states are operated in widely scattered localities, encompassing great distances, and under widely diversified and constantly changing conditions, and that it is necessary to the successful operation of plaintiff's business and the preservation of its property and business that plaintiff sell its product at each of the plants or stations in Montana and other adjoining states at prices fixed and determined by it to be the proper charges in the light of existing conditions and to change its prices at any of its plants or stations when it is necessary to do so to meet the changing conditions existing thereat; that all of the conditions existing at each plant and station have relation to and are properly to be taken into consideration in fixing and determining the price at which it will sell its product; plaintiff must charge therefor a price which will vary and be influenced by existing conditions; and the price to be charged at any particular plant or station within Montana cannot be controlled or fixed by the price charged at its other plants and stations, nor by the price at which it sells its products in adjoining states.

It is alleged, and admitted by the defendants, that the establishment of a differential basal rate point has little or no relation to the conditions and factors alleged by plaintiff as entering into the cost of conducting business at its various stations and plants, and does not make conditions uniform at plaintiff's plants and stations in Montana or in adjoining states, nor can a proper differential in the prices at which plaintiff sells and will sell its products at its various stations

and plants be established, based on or determined solely with reference to the differential basal rate point, and if plaintiff is compelled to sell its products at a price which does not take into consideration the conditions existing at each of its plants and stations independent of the others which enter into the cost of doing business thereat and which affect the price at which plaintiff's products can be sold at a profit thereat, plaintiff's profits may or will be reduced. It is alleged and admitted that the defendant commission threatens to and will, unless restrained by this court, enforce the Act.

Plaintiff alleges that if it is compelled to sell its products at a price which does not take into consideration the conditions existing at each of its stations or plants independently of the others, and which enter into the cost of doing business thereat, and which affect the price at which plaintiff's products can be sold at a profit, plaintiff will be deprived of its property without due process of law, and of its freedom to contract, and it will be denied the equal protection of the law. The complaint makes specific attacks upon the Act, wherein alleged conflicts with the provisions of the federal and state Constitutions are set forth.

In the answer it is alleged that the people of Montana own and operate approximately 120,000 motor vehicles consuming in the operation thereof about seventy million gallons of gasoline at a retail cost of about $15,500,000, from which the license taxes derived from the sale are about $3,500,000 annually; that regarded as an article of commerce gasoline enters largely into the lives, welfare, and happiness of the people of Montana; that the state is engaged in the construction of highways 1,500 miles or more in length, which will not be completed for several years to come, the cost of construction of which must be met largely, if not entirely, from such tax.

It is also alleged that in many instances people living in places far removed from oil refineries pay less for gasoline than people living in close proximity to an oil refinery; that the price of gasoline is usually lower in aljoining states than it is in Montana; and that some of the people of this state who live

within ten or fifteen miles of a border state make a practice of purchasing in the border state the gasoline they need, thereby reducing to that extent the revenue to which Montana is entitled.

Plaintiff admits that at various times the price of gasoline is lower in states which adjoin Montana than it is in this state.

1. That which impelled the legislative mind in the enactment of the measure—the laudable purpose of preventing unjust discrimination in the sale of petroleum products—is certain; about everything else in the Act is uncertain.

Among the allegations of the complaint plaintiff pleads that the Act is so ambiguous, uncertain, unintelligible and lacking in definition and substance that it is impossible for a seller of gasoline to know what conduct on his part will render him liable to its penal provisions; and the terms thereof are so vague that men of common intelligence necessarily must guess at its meaning, and differ as to its application. These allegations are unanswerable. Putting minor uncertainties and ambiguities aside, it is seen that in the first part of section 1 the Act purports in direct terms to subject a person to criminal prosecution if he charges or demands a higher price for a "standard petroleum product" at one point in the state "than is being charged" by him for a like article, sold presumably, to any other person in this state or in an adjoining state; if he does that he is deemed guilty of discrimination which is declared to be a fraud and a crime. Later on in the very same section it is provided, in effect, that upon the trial of the person for the act denounced as a crime in the forepart of the section he may prove that the difference in price was justified. The Act does not provide any measuring stick, or prescribe any standard of conduct, for the guidance of the person, or the officers of the law, at any time; it does not give any information as to what will, or will not, amount to a justifiable difference in price, or what elements and conditions may be taken into consideration in determining the matter. It not only omits to furnish a guide to the seller; it fails to give any direction to the officers of the law as to how the law shall be administered. It leaves the

court—the tribunal which must determine whether the person is guilty of a crime—without information with respect to the elements which go to make up the crime. If the prices charged are justifiable, no crime has been committed. Without prescribing any standard of conduct, how is anyone to determine whether the act done carried a criminal intent? If he relies upon the latter part of the section, the seller must proceed at his risk; he cannot determine with any degree of certainty what prices charged by him will render him liable to criminal prosecution, and also to the heavy penalites which may be imposed in a civil suit. If he attempts to rely upon the poor assurance that differences in prices are permitted, if justified, upon what may he rely as to what will constitute justification? As counsel aptly inquire: What is there in the Act by which the seller can know what would be a legal defense if the price charged by him for his products in Montana exceeds the price charged in an adjoining state?

Is it a legal justification for a higher price in Montana that the gasoline tax is higher in this state than in an adjoining state, or that the cost of doing business here is greater than in an adjoining state? The Act does not say. If the seller does business in North Dakota and in Idaho as well as in Montana, and the price is different in North Dakota and in Idaho from that in Montana, which one of the prices is the guide for a charge in Montana? The Act gives no direction. Who is to say which adjoining state is to become the criterion for the price in Montana? Is it the state wherein the charge is the lowest?

The plaintiff complains that, because of the deficiencies and ambiguities of the Act, by every sale it makes, potentially it commits a criminal offense and furnishes the basis for a civil action against it; that there is no standard of criminality or civil conduct provided in the Act by which it can determine whether or not its sales, necessarily different throughout its wide field of activity, violate the Act. These assertions have merit.

Boiled down, this Act says to the well-meaning citizen: It is true that you may lawfully sell gasoline at different prices to different persons in different parts of the state, but if you do you may be charged with a crime, arrested and brought to trial. A case will be made out against you by proof of the fact that you did sell gasoline to different persons at different prices, as charged. You may exculpate yourself by showing you were *justified* in charging the difference, and will be permitted to resume your liberty. The humiliation suffered by yourself and family, and the vexation and expense to which you have been put, you must attribute to the law which has victimized you in an effort to see that somebody else is not cheated.

To sum up, it is impossible for a citizen, engaged in the business of selling a standard petroleum product, upon reading the text of the Act, to determine when he is subject to penalties. (*State* v. *Holland*, 37 Mont. 393, 96 Pac. 719.) " 'Laws which create crime ought to be so explicit that all men subject to their penalties may know what acts * * * to avoid.' (*United States* v. *Brewer*, 139 U. S. 278, 11 Sup. Ct. 538, 35 L. Ed. 190.) 'In order to constitute a crime, the act must be one which the party is able to know in advance whether it is criminal or not. The criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable. There must be some definiteness and certainty.' (*Tozer* v. *United States,* (C. C.) 52 Fed. 917.) 'If the legislature undertakes to define by statute a new offense, and provide for its punishment, it should express its will in language that need not deceive the common mind. Every man should be able to know with certainty when he is committing a crime.' (*United States* v. *Reese*, 92 U. S. 214, 23 L. Ed. 563.) '' (*Burk* v. *Montana Power Co.*, 79 Mont. 52, 255 Pac. 337, 339.)

"That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of

law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." (*Connally* v. *General Construction Co.*, 269 U. S. 385, 46 Sup. Ct. 126, 127, 70 L. Ed. 322.)

"The dividing line between what is lawful and unlawful cannot be left to conjecture. The citizen cannot be held to answer charges based upon penal statutes whose mandates are so uncertain that they will reasonably admit of different constructions. A criminal statute cannot rest upon an uncertain foundation. The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue. Penal statutes prohibiting the doing of certain things, and providing a punishment for their violation, should not admit of such a double meaning that the citizen may act upon the one conception of its requirements and the courts upon another." (*United States* v. *Capital Traction Co.*, 34 App. D. C. 592, 19 Ann. Cas. 68.)

2. The Act is in nowise clarified by the provision respecting the establishment of one or more differential basal rate points "to be used as a basis for determining gasoline and petroleum product rates." Does "rates" mean the selling price? Possibly it does, for the title of the Act provides for "procedure for the determination of the prices under this Act."

The Act does not undertake to repose in anyone (if that were permissible) the power to determine rates, or prices, and omits to give any direction as to how a basal rate point shall be employed in fixing rates. Incidentally, it will be noted that under subdivision (b) of section 3 authority is granted to the Public Service Commission only to make reasonable rules and regulations regarding the *distribution* of gasoline and petroleum products. Assuming that it was the intention of the framers of the law to allow a differential as between basal rate points and other places, what factors must be taken into consideration in arriving at a proper differential in price? The

Act gives no information. As we have seen, the Act attempts to make it a penal offense for a person to sell petroleum products at a higher price to one person in Montana than he sells them to another person. If this be true, it follows that no differential in price between the basal rate point and other points can be allowed; and yet if a seller is prosecuted for charging a higher price to one person than he charges to another in the state, the burden is upon the seller to show that the higher price was justified, which seems to imply that a higher price may be charged at some places in the state than is charged in others. Because of these deficiencies and uncertainties we think counsel for plaintiff are warranted in saying "that neither the seller nor the buyer in Montana can know when the price charged violates the Act."

3. Here a pronouncement of this court from the pen of Chief Justice Brantly applies in all force: "If an Act of the legislature is so vague and uncertain in its terms as to convey no meaning, or if the means for carrying out its provisions are not adequate or effective, or if it is so conflicting and inconsistent in its provisions that it cannot be executed, it is incumbent upon the courts to declare it void and inoperative." (*Hilburn* v. *St. Paul, M. & M. Ry. Co.*, 23 Mont. 229, 58 Pac. 551, 555, 811; *State ex rel. Holliday* v. *O'Leary*, 43 Mont. 157, 115 Pac. 204.)

4. If the Act is a price-fixing measure, judgment is foreclosed against it; for it is settled by recent decisions of the supreme court of the United States that a state legislature is without power to fix prices at which commodities may be sold, service rendered or property used, unless the business or property involved is "affected with a public interest." (*Williams* v. *Standard Oil Co.*, 278 U. S. 235, 49 Sup. Ct. 115, 116, 73 L. Ed. 287, 60 A. L. R. 596; *Wolff Packing Co.* v. *Court of Industrial Relations*, 262 U. S. 522, 43 Sup. Ct. 630, 634, 67 L. Ed. 1103, 27 A. L. R. 1280; *Tyson & Bro.* v. *Banton*, 273 U. S. 418, 47 Sup. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236.)

The phrase "affected with a public interest," said the court in the *Williams Case,* supra, "has become the established test

by which the legislative power to fix prices of commodities, use of property, or services, must be measured. As applied in particular instances its meaning may be considered both from an affirmative and a negative point of view. Affirmatively it means that a business or property, in order to be affected with a public interest, must be such or be so employed as to justify the conclusion that it has been *devoted* to a public use and its use thereby in effect *granted* to the public. (*Tyson & Bro.* v. *Banton,* supra, 434.) Negatively it does not mean that a business is affected with a public interest merely because it is large or because the public are warranted in having a feeling of concern in respect of its maintenance." Unless the business or property comes within the affirmative view of the test, a legislative fiat cannot place it there. Legislative declaration may not cause that to exist which the facts and the law deny. If it were otherwise, as Judge Bourquin said in *A. M. Holter Hardware Co.* v. *Boyle,* (D. C.) 263 Fed. 134, 135, "inalienable rights guaranteed by the Constitution would be at the mercy of Legislatures. Fundamental rights are independent of legislative will, and no legislative declaration can foreclose inquiry whether or not they are infringed by legislative enactment."

That the business which is the subject of this inquiry—one which affects society in general (*State ex rel. Public Service Com.* v. *Brannon,* 86 Mont. 200, 283 Pac. 202, 67 A. L. R. 1020)—is a proper subject of regulation is beyond question. But as Chief Justice Taft declared in *Wolff Packing Co.* v. *Court of Industrial Relations,* supra: "To say that a business is clothed with a public interest is not to determine what regulation may be permissible in view of the private rights of the owner. The extent to which an inn or a cab system may be regulated may differ widely from that allowable as to a railroad or other common carrier. It is not a matter of legislative discretion solely. It depends on the nature of the business, on the feature which touches the public, and on the abuses reasonably to be feared. To say that a business is clothed with a public interest is not to import that the public may take over its entire management and run it at the expense

of the owner. The extent to which regulation may reasonably go varies with different kinds of business. The regulation of rates to avoid monopoly is one thing. The regulation of wages is another. A business may be of such character that only the first is permissible, while another may involve such a possible danger of monopoly on the one hand, and such disaster from stoppage on the other, that both come within the public concern and power of regulation. If, as, in effect, contended by counsel for the state, the common callings are clothed with a public interest by a mere legislative declaration, which necessarily authorizes full and comprehensive regulation within legislative discretion, there must be a revolution in the relation of government to general business. This will be running the public interest argument into the ground, to use a phrase of Mr. Justice Bradley when characterizing a similarly extreme contention. (*Civil Rights Cases,* 109 U. S. 3, 24, 3 Sup. Ct. 18, 27 L. Ed. 835.) It will be impossible to reconcile such result with the freedom of contract and of labor .secured by the Fourteenth Amendment.''

The legislature of Tennessee undertook to fix prices at which gasoline might be sold in that state. Some of the arguments were advanced there which the Attorney General urges here. The supreme court of the United States said: ''In support of the Act under review it is urged that gasoline is of widespread use; that enormous quantities of it are sold in the state of Tennessee; and that it has become necessary and indispensable in carrying on commercial and other activities within the state. But we are here concerned with the character of the business, not with its size or the extent to which the commodity is used. Gasoline is one of the ordinary commodities of trade, differing, so far as the question here is affected, in no essential respect from a great variety of other articles commonly bought and sold by merchants and private dealers in the country. The decisions referred to above make it perfectly clear that the business of dealing in such articles, irrespective of its extent, does not come within the phrase 'affected with a public interest.' '' (*Williams* v. *Standard Oil Co.,* supra.)

In view of this controlling decision, if the legislature, by declaring a "standard petroleum product" to be a "public utility" [see *City of Denton* v. *Denton Ice Co.,* (Tex. Com. App.) 18 S. W. (2d) 606], meant to declare the business or property "to be affected with a public interest," the effort was wasted.

The Attorney General relies upon *Cap. F. Bourland Ice Co.* v. *Franklin Utilities Co.,* 180 Ark. 770, 22 S. W. (2d) 993, 68 A. L. R. 1018, but the statute there involved is very different from the one here. However, in view of the more recent decision of the supreme court of the United States in *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 52 Sup. Ct. 371, 76 L. Ed. 747, the soundness of the Arkansas case may well be doubted.

Chapter 184, supra, cannot be sustained upon any theory.

It is ordered that a permanent injunction issue forthwith as prayed in plaintiff's complaint.

ASSOCIATE JUSTICES ANGSTMAN, MATTHEWS, STEWART and ANDERSON concur.